**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-225 (DLF)** |
| **v.** | : | |
| | : | |
| **TRENISS JEWELL EVANS III,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Treniss Jewell Evans III to 60 days of incarceration, one year of supervised release, 60 hours of community service, and restitution in the amount of $500.

**I.      Introduction**

Treniss Jewell Evans III, a resident of Canyon Lake, Texas, participated in the January 6, 2021 attack on the United States Capitol, a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

On March 10, 2022, Evans pleaded guilty to one count of 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds.  As explained herein, a sentence of 60 days

---

[1]      As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.   That amount reflects, among other things, damage to the Capitol building and grounds and certain costs borne by the United States Capitol Police.

of imprisonment, with supervised release to follow, is appropriate in this case because: (1) Evans traveled to Washington, D.C. in early January 2021 with knowledge that violent groups, including the Proud Boys, would participate in the protest and, indeed, with plans to meet up with members of the Proud Boys in Washington, D.C.; (2) Evans entered (and later exited) the Capitol building by stepping through broken windows, which had been smashed open by other rioters; (3) once inside, Evans turned back to face the broken window where other rioters were visible outside, raised a megaphone, and declared, "Bring 'em in"; (4) after entering the Capitol building, Evans walked by a line of U.S. Capitol Police officers who were blocking off a corridor, many of them in riot helmets with clear plastic face shields; (5) inside the Capitol, Evans entered a Congressional conference room, which he believed to be Speaker Nancy Pelosi's, and had someone record a video of him drinking a shot of whiskey; (6) since January 2021 and through the present, Evans has made statements on social media demonstrating a lack of genuine remorse and has raised money off his participation in the January 6 attack; and (7) Evans has glorified political violence on social media, including by saying in February 2022 that he "love[d]" a post threatening to "stack bodies" if members of the "deep state" did not "surrender."

The Court must also consider that Evans's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Evans's participation in a riot that actually succeeded in halting the Congressional certification – combined with his attempt to join a violent group, his celebration

and endorsement of the forcible takeover of Congress on that day, his lack of remorse, and the potential for involvement in violent protests in the future – renders a significant jail sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol set forth in Evans's plea agreement.  *See* ECF 33 (Statement of Offense), at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop, we turn to Evans's conduct on January 6.

### *Treniss Evans's Role in the January 6, 2021 Attack on the Capitol*

In mid-December 2020, Treniss Evans traveled to Washington, D.C. to protest the outcome of the 2020 Presidential election.  On December 12, 2020, while in Washington, D.C., Evans emailed an address associated with a Texas chapter of the Proud Boys, asking to join the action: "I want in and I am in Washington DC staying at the Marriott at Freedom Plaza."[2]  In an email to another individual associated with the Texas Proud Boys, Evans wrote, "I want in, how do we fight commies and liberals?."[3]  That day, and especially the following night, members of the Proud Boys were involved in multiple violent confrontations in downtown Washington, D.C.[4]  The next day, Evans redoubled his efforts to join the group.  In a follow-up email to a Proud Boys contact, Evans boasted that the had been "with [the] Chicago and Philly chapter mostly last night [December 12,

---

[2]      Gov't Ex. 1.
[3]      Gov't Ex. 2.
[4]      *See, e.g.*, NPR, *4 Stabbed, 33 Arrested After Trump Supporters, Counterprotesters Clash In D.C.* (Dec 13, 2020), https://www.npr.org/2020/12/12/945825924/trump-supporters-arrive-in-washington-once-again-for-a-million-maga-march (last visited May 14, 2022).

2020] as well as others in the thick of this all night until 2:30 am."[5]  Evans also bragged: "I got me some!  Chicago PB [Proud Boy] Paul and another PB were in the thick of it with me twice. … I drove from Texas to help, I am now driving to Georgia to get with the PB Chapter there and support."[6]  A few days later, despite having been told that the Proud Boys were not accepting new members at the time, Evans told the same representative, "I will be back in DC 4th-7th or 8th.  … I understand your position on new members[.]  …  I look forward to meeting you guys."[7]  By then, Evans had also separately offered another member of the Proud Boys – this one located in the Atlanta, Georgia area – to "outfit one of your righteous men who need gear."[8]  Evans also reiterated that, days earlier, he "was in the streets of DC with Philly, Chicago and El Paso members getting some."[9]

In late December 2020 and early January 2021, Evans began arrangements for his upcoming trip to Washington, D.C., where he planned to attend the "Stop the Steal" rally as well as a Second Amendment demonstration.  On or about January 4 and 5, 2021, Evans drove from Canyon Lake, Texas to Washington, D.C.  Along the way, he stopped in Georgia to pick up a friend, who accompanied him for the rest of the drive.

On the morning of January 6, 2021, Evans attended the "Stop the Steal" rally, at which the President spoke.  As the rally was concluding, Evans headed toward his hotel in Freedom Plaza and then toward the U.S. Capitol building with other protestors.  He was wearing a bright yellow knit cap, olive green jacket, blue jeans, and a camouflage backpack.  He also carried a blue megaphone.

---

[5]     Gov't Ex. 2.
[6]     *Id.*
[7]     Gov't Ex. 3.
[8]     Gov't Ex. 4.
[9]     *Id.*

At approximately 3:00 p.m., Evans entered the Senate Wing of the Capitol building by stepping through a broken window beside the breached Senate Wing Doors.  The glass panes of the window had been smashed open by other rioters about 47 minutes before the defendant entered, and broken glass or other debris was visible on the inside sill of the window.   Inside and immediately to the left of the broken window through which Evans entered, a line of Capitol Police officers stood, blocking off one direction of the corridor.  The police officers were wearing full uniforms, to include marked helmets or caps, with police badges, duty belts, and official insignia clearly displayed.  Many of the police officers were wearing riot helmets with clear plastic face shields down.  A high-pitched, continuous alarm could be heard.[10]



---

[10]     Gov't Ex. 5 (at 9:45 – 10:00, on file with the Court); Gov't Ex. 6 (3:00:55 p.m. – 3:02:20 p.m., on file with the Court).



Figures 1 and 2: Evans entering the Capitol building through a broken window and facing a line of Capitol Police officers

Once inside, Evans turned back to face the broken window where other rioters were visible outside.  Evans then raised his megaphone to his mouth and stated, "Bring 'em in."[11]



---

[11]     Gov't Ex. 5 (at 10:00 – 10:15); Gov't Ex. 6 (3:01:15 p.m. – 3:01:25 p.m.).



Figures 3 and 4: Evans using a megaphone to encourage other rioters to enter the Capitol building

Evans then marched through a corridor toward the Crypt of the Capitol. Along the way, he used his megaphone to address other rioters, stating, "We want justice," as well as "Back the blue." Evans also led other rioters in the Pledge of Allegiance and the Star Spangled Banner. At approximately 3:11, Evans used his megaphone to address other rioters inside the Crypt.[12] In a video he recorded on his cell phone, Evans can be heard declaring: "Remember: do not break, do not damage, do not harm. We are in a peaceful protest. We are executing our constitutional duty when we have been cheated from a stolen election."[13] Moments later, a Capitol Police officer asked Evans: "What time do you think we can get some people out [inaudible]?"[14] Evans – who only minutes earlier had incited others to break into the Capitol building – responded, "There is

---

[12]     Gov't Ex. 7 (3:11:15 p.m. – 3:11:25 p.m.).
[13]     Gov't Ex. 8 (on file with the Court).
[14]     *Id.*

more coming."[15]   Then, after telling the officer "we're not here to hurt you," Evans continued:

"You see what's happened, this has finally happened."[16]



Figure 5: Evans addressing other rioters in the Crypt of the Capitol building with a megaphone

Evans then walked back toward the Senate Wing Doors, but did not head for the exit.   He

took a detour to enter a Congressional conference room, which other rioters told him belonged to

Speaker Pelosi.   While in that room, Evans again used his megaphone to address other rioters.   He

then climbed on the inside sill of a window, looked out to the mob assembled outside – which was

facing a line of officers – and gestured triumphantly in the mob's direction.[17]

---

[15]     *Id.*
[16]     *Id.*
[17]     Gov't Ex. 5 (at 21:20 to 21: 50).



Figure 6: Evans standing on a window sill in a Congressional conference room and gesturing triumphantly to the mob outside

While in the room, Evans also recorded a video of himself. Looking into the camera, Evans asked, "Hey, how many of you have been in Nancy Pelosi's office before? I like it. I think I want to hang out."[18] He then proceeded to drink a gulp of Jack Daniels whiskey from another rioter's bottle.[19] Moments later, he had another rioter record him as he took a celebratory shot of Fireball whiskey that Evans had apparently brought with him.[20]

---

[18]    Gov't Ex. 9 (on file with the Court).
[19]    *Id.*
[20]    *Id.*



Figures 7 and 8: Evans drinking shots of whiskey in a Congressional conference room

Evans exited the Capitol building after approximately 16 minutes, again through a broken window beside the Senate Wing Doors.[21]  As noted, at various points during his time inside the Capitol building, Evans used his cell phone to record video footage of himself and of the events that were occurring.

Outside the Capitol building, Evans again used his megaphone to address other rioters.  At one point, he read out former President Trump's statement on Twitter attacking then-Vice President Pence: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the

---

[21]      Gov't Ex. 10 (3:15:16 p.m. – 3:16:00 p.m., on file with the Court).

truth!"  He also stated: "I don't support looting, I don't support violence, I support a peaceful protest to put them on notice that we the people demand justice."[22]

*Social Media Posts*

Since the attack on the Capitol, Evans has used GETTR, a social media platform, to spread false information about the January 6 attack through public postings, including claims that most rioters entered the Capitol largely because police "were not even telling them not to" and were not "attempting to stop them"; to downplay his own culpability by attacking law enforcement; to fundraise from his participation in the January 6 attack; and to glorify the use of political violence. A selection of Evans's statements on GETTR is illustrative:

On October 17, 2021, Evans claimed in a public posting, "I am pretty sure most January 6th protestors were protestors who made bad decisions to trespass in the Capitol largely because police were not even telling them not to much less attempting to stop them";[23]

On November 28, 2021, Evans posted a link to his crowd-funding page, stating: "YES I WAS AT THE CAPITOL JANUARY 6TH.  I need your help to continue to speak publicly";[24]

On December 27, 2021, Evans posted, "Fraud Biden's days are numbered in 2022.  The audits truths will deliver arriving day by day.  The red wave of justice will swallow the evi [sic] cloaked in blue.  Those in congress absolved those who said ney.  Wee little rats who stole will dodge scurry and run as they do.  Soon caught in the scale of justice like traps and squeal. … Patriot Prophet 12-27-21";[25]

---

[22]    https://www.youtube.com/watch?v=j0slfwAXc2k (at 12:30 – 13:12).
[23]    Gov't Ex. 11.
[24]    Gov't Ex. 12.
[25]    Gov't Ex. 13.

On December 31, 2021, Evans reposted the following image, originally posted by another user, with the comment: "I feel this coming.  I hope it is done peacefully":[26]



---

On January 3, 2022, Evans again used his participation in the January 6 attack to raise funds ("January 6th Political Speaker and defendant!"), posting a link to his crowd-funding page;[27]

On January 6, 2022, Evans posted: "Today makes one year since my protest inside The United States Capitol. …   The fateful day where lives of Patriots were needlessly lost in defense of our sacred elections.  Those inside the building were fearful and many in defense of the Capitol were injured.  The sick, evil, and duplicitous government has subverted the blame and remorse they should share.  The ruling class placed all blamed on the heads of those who protested their dereliction of duty and failure to represent their citizens";[28]

On January 26, 2022, Evans posted about the "cowards in the alphabet agencies" who "do nothing as Americans are being persecuted and destroyed"; he tagged the post with hashtag #j6politicalprisoners;[29]

On February 13, 2022, Evans posted, "I am January 6th and now a victim of a two tier justice system run by terrorists!";[30]

On February 25, 2022, Evans reposted a picture, originally posted by another user, that threatened the "DEEP STATE" with violence, adding: "I LOVE THIS! THE TIME FOR THE RIGHTS OF WE THE PEOPLE IS COMING";[31]

---

[27]     Gov't Ex. 15.
[28]     Gov't Ex. 16.
[29]     Gov't Ex. 17.
[30]     Gov't Ex. 18.
[31]     Gov't Ex. 19.



On March 10, 2022, the same day on which Evans pleaded guilty in this case, he declared in a post: "We The People-CITIZENS are now the greatest victims of lawfare (this is called tyranny) this Country has ever witnessed.  Welcome to the Tyrannical States of America";[32]

On March 14, 2022, Evans again impugned the legitimacy of the 2020 Presidential election (and, thus, of Congress' certification on January 6, 2021): "The commies should have never been allowed into the Whitehouse and should have been dealt with as the treasonous coup they are for STEALING your ELECTIONS.  Nothing they have done is either legitimate or Constitutional";[33]

---

[32]      Gov't Ex. 20.
[33]      Gov't Ex. 21.

On March 20, 2022, Evans posted, "January 6th Defendants are among those WRONGFULLY SHAMED!"[34]

In addition, Evans has repeatedly used his participation in the January 6 attack to promote traffic to his website (www.condemnedusa.com) and increase viewership of his January 6-related media interviews.[35]

*The Charges and Plea Agreement*

On February 24, 2021, Evans was charged by complaint with violating 18 U.S.C. §§ 1512(c)(2), 1752(a)(1), and 1752(a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 4, he was arrested at his home in Texas. On March 17, 2021, the grand jury charged Evans with the five offenses identified in the complaint. On April 19, 2021, Evans voluntarily agreed to be interviewed, and was interviewed, by the FBI about his participation in the January 6, 2021 attack. On March 10, 2022, Evans pleaded guilty to Count Two of the Indictment, which charged him with violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds. By plea agreement, Evans agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Evans now faces a sentencing on one count of violating 18 U.S.C. § 1752(a)(1). As noted in the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his

---

[34]     Gov't Ex. 22.

[35]     *See, e.g.*, Real America's Voice, *Is the FBI Trying to Punish Jan 6th Protestors Outside the Courts?*, https://americasvoice.news/is-the-fbi-trying-to-punish-jan-6th-protestors-outside-the-courts/ (last visited May 14, 2022); Real America's Voice, *Jan 6th Protestor Recounts the Shock of Charges*, https://americasvoice.news/jan-6th-protestor-recounts-the-shock-of-charges/ (last visited May 14, 2022).

plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-1079 (D.C. Cir. 2008).

### IV.     The Sentencing Guidelines and Guidelines Analysis

The Supreme Court has instructed that district courts "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Cordon's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG § 3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 31-40.

The U.S. Probation Office calculated Evans's criminal history as a category I, which is not disputed.  PSR at ¶ 43.  Accordingly, the U.S. Probation Office calculated Evans's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months.  PSR at ¶ 76.  Evans's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement), and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A. The Nature and Circumstances of the Offense

1.     The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would, at a minimum, have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, the Court must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether the defendant encouraged others to join in the attack; (6) whether during or after the riot, the defendant destroyed evidence; (7) the length of the defendant's time inside of the building, and exactly where the defendant traveled and what he did in those locations; (8) the defendant's statements in person or on social media; (9) the extent of the defendant's planning before the riot and his foreknowledge that it would involve violent conduct; (10) whether the defendant cooperated with, or ignored, commands from law enforcement officials; and (11) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or

destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

2.     By the time Evans crossed into the Capitol's restricted grounds on January 6, he had ample forewarning that he mob that descended on the Capitol would engage in violent, criminal conduct.  Three weeks earlier, on December 11 and 12, 2020, Evans had made a first trip to Washington, D.C. to protest the outcome of the 2020 Presidential election.  During that visit, Evans made contact with members of the Proud Boys from multiple states.  According to his statements at the time, he also witnessed the Proud Boys battling other groups in violent confrontations.  In the following days, despite having first-hand knowledge of the Proud Boys' violent tactics, Evans made repeated (but unsuccessful) attempts to join their ranks.

Nor was Evans's interest in the Proud Boys somehow limited to peaceful protesting.  In an email to a Texas Proud Boys representative, Evans specifically bragged – whether truthfully or not – about fighting alongside the Proud Boys in the streets of Washington, D.C. on December 12, 2020.  He claimed that he had been "in the thick of this" with several Proud Boys "all night until 2:30 am"; that "I got me some!"; and that "Chicago PB Paul and another PB were in the thick of it with [Evans] twice."[36]  Indeed, despite having been turned down by the Proud Boys, Evans reaffirmed that he planned to travel to Washington, D.C. January "4th-7th or 8th" and that he "look[ed] forward to meeting [the Proud Boys]" there.[37]  By then, Evans had also offered, in a separate email thread, to assist the Proud Boys' Atlanta chapter by supplying tactical gear for "one of your righteous men."[38]

---

[36]     Gov't Ex. 2.
[37]     Gov't Ex. 3.
[38]     Gov't Ex. 4.

These facts are important because they show a substantial amount of preparation and commitment by Evans.  They also show, at a minimum, that, by the time he arrived at the Capitol on January 6, Evans knew that the mob he was joining included elements who were likely to engage in violent conduct.

3.     The scene Evans encountered as he entered the Capitol building left no doubt that he was joining a violent riot, not a peaceful protest.  Evans did not enter the Capitol building through a door.  He came in through a shattered window that had been smashed in by other protestors less than one hour earlier.  While no police officers physically blocked Evans's path as he entered, the signs of violent entry and ongoing criminality were unmistakable.  Broken glass and other debris were still visible on the inside sill of the window.  Immediately to his left, Evans faced a line of U.S. Capitol Police officers blocking off one direction of the corridor, many of them wearing riot helmets.  To his right, he faced a damaged piece of furniture, seemingly turned on its side, that obstructed part of the hall immediately in front of the Senate Wing Doors.  A high-pitch, continuous alarm could be heard, similar to a fire alarm.

The mayhem did not cause Evans to reconsider.  To the contrary, seconds after entering the Capitol through the shattered window, Evans – who had come to the Capitol carrying a megaphone, evidently intent on influencing other rioters – turned back to the rioters gathered outside and said through his megaphone: "Bring 'em in."  He then moved deeper into the Capitol building, spending several minutes in the Crypt.  When Evans turned back, he did not head for the exit.  He deliberately detoured into a Congressional conference room, which he had been told (incorrectly) belonged to Speaker Pelosi.  In that room, Evans climbed onto a window's sill, looked at the mob outside (which was facing a line of police officers), and gestured triumphantly toward

the mob.  He also boasted that he was "hang[ing] out" in (what he believed to be) Speaker Pelosi's office.  And he took a victory shot of Fireball whiskey.

These facts show that Evans broke into the Capitol with full appreciation that he was joining the forcible takeover of a government institution.[39]  They also show that he incited others to join in that takeover, encouraging other rioters to enter the building and giving instructions through a megaphone.  His theatrical celebration as he took in the sight of the mob outside – combined with his celebratory drinking in a Congressional office space – further crystallizes Evans's true objective as he entered the Capitol on January 6, 2021.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Evans's criminal history is limited to a 1994 conviction for reckless driving when he was 19 years old.  Evans also reported to the U.S. Probation Office information suggesting that he is active within his community, and that he has maintained a productive family and professional life.  Accepting Evans's self-reported information as accurate,[40] it does not meaningfully mitigate Evans's culpability in connection with January 6, 2021.  In fact, it renders his conduct on January 6, 2021 all the more troubling.

In January 2021, Evans was a 46-year-old adult with strong ties to his family, to his community, and to his church.  Having witnessed, and possibly been involved in, the Proud Boys' violent confrontations in the streets of Washington, D.C. on December 12, 2020, Evans had no

---

[39]    To be sure, while on Capitol grounds, Evans at times purported to remind other rioters to abstain from further acts of violence and destruction of property.  But, even assuming those statements were sincere, the fact that Evans did not personally seek out violence and destruction after the Capitol had been seized and the certification process halted does not diminish his role as a participant in the mob that collectively took over the Capitol in the first place.  In any event, as noted above, had Evans personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct.

[40]    Portions of Evans' self-reported information do not appear to have been verified.

excuse to seek out more lawbreaking on January 6.  He cannot blame his poor judgment on lack of maturity, on naivety about political demonstrations, or on social isolation during the COVID-19 pandemic.  Nor was Evans's decision to follow the violence on January 6 a spur-of-the-moment decision.  Evans had weeks – not to mention a 1,500-plus-mile drive from Texas to Washington, D.C. – to consider whether and how to join the January 6 protests if, as predictable, the demonstrators turned on Congress and the Capitol grounds.  Yet, despite all those opportunities for better judgment and despite all his life experiences and networks, Evans settled on the illegal choice: he wanted to be "in the thick of it" – just as he had bragged about being "in the thick of it" only weeks earlier.

Evans's conduct was inexcusable.  The fact that he chose it despite his personal accomplishments and despite his recent brush with street violence weeks earlier only makes Evans's conduct more egregious.  It demonstrates a very real need to for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[41]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

---

[41]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House  Oversight  and  Reform  Committee  (June  15,  2021),  available  at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *see United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters – especially those who intend to improperly influence the democratic process – that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Treniss Evans's conduct since January 6 confirms the need for specific deterrence for this defendant.  As described in more detail above, despite occasionally professing remorse for his conduct on January 6, Evans has repeatedly downplayed the violence that occurred on that day and attempted to paint himself as a victim of government overreach.  On October 17, 2021, for example, Evans stated in a GETTR posting, "I am pretty sure most January 6th protestors were protestors who made bad decisions to trespass in the Capitol largely because police were not even telling them not to much less attempting to stop them."[42]  This is flatly untrue as Evans well knows.  At approximately 3:00 p.m. on January 6, 2021, Evans climbed through a shattered window to unlawfully enter the Capitol building and join a horde of rioters.  He then incited rioters who stood outside the Senate Wing Doors to break into the Capitol building ("Bring 'em in") – even as he

---

[42]      Gov't Ex. 11.

stood only feet away from a line of Capitol Police officers, many of them wearing riot helmets as they were trying to block off one side of the corridor.  He also ignored the alarm resonating through the Capitol.  Despite knowing all this, since January 2021, Evans has used his own presence at the riot to spread false propaganda that January 6 was a largely "peaceful" protest.

Evans's recurrent attempts to paint himself and other January 6 defendants as victims are also troubling.  On February 13, 2022, he declared in a GETTR posting, "I am January 6th and now a victim of a two tier justice system run by terrorists!"[43]  Weeks later, on March 10, 2022, the same day he pleaded guilty in this case, Evans stated in reference to those involved in the January 6 attack, "We The People-CITIZENS are now the greatest victims of lawfare (this is called tyranny) this Country has ever witnessed.  Welcome to the Tyrannical States of America."[44]  These statements reveal a complete lack of *genuine* remorse, a conclusion that is further underscored by Evans's efforts to cash in on his participation in the attack.[45]  They also foreclose any suggestion that Evans has learned from his mistakes and can be trusted to distinguish between peaceful protesting and violent rioting in the future.

Treniss Evans's failure to learn from his mistakes is particularly concerning in light of his continued penchant for glorifying political violence.  On December 31, 2021, Evans celebrated the arrival of 2022 as the year in which "WE THE PEOPLE TAK[E] AMERICA BACK COME HELL OR HIGH WATER" – against the background of a red nuclear mushroom cloud.  He commented, "I feel this coming.  I hope it is done peacefully" – an unmistakable message that the

---

[43]     Gov't Ex. 18.

[44]     Gov't Ex. 20.

[45]     *See, e.g.*, Gov't Ex. 12 ("YES I WAS AT THE CAPITOL JANUARY 6TH.  I need your help to continue to speak publicly."); Gov't Ex. 15 ("January 6th Political Speaker and defendant!" post, with link to Evans's crowd-funding page).

"taking … back [of] America" may come *not* peacefully.[46]  Then, as another example, on February

25, 2022, he reposted a picture of an armed man sending a "MESSAGE FOR THE DEEP STATE":

> BE ADVISED.  THERE ARE 16 MILLION PLUS VETERANS IN THIS COUNTRY WHO ONCE THEY FIND OUT WHAT YOU'VE DONE ARE GONNA BE MORE THAN WILLING TO STACK BODIES AND SAVE CHILDREN[.]   PRESIDENT TRUMP HAS AN ARMY THE SIZE OF WHICH HAS NEVER BEEN SEEN ON THE EARTH[.]   THERE IS NOWHERE ON EARTH YOU CAN HIDE, SURRENDER WHILE YOU CAN.[47]

Evans commented: "I LOVE THIS!  THE TIME FOR THE RIGHTS OF WE THE PEOPLE IS

COMING."  The fact that Evans continues to glorify political violence undermines any suggestion

that he has learned his lesson from his poor judgment on January 6.  It also creates an unacceptable

risk that he will be willing to participate in violent rioting in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

1.     As the Court is aware, the government has charged hundreds of individuals for their

roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such

as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[48]  Each offender must be sentenced based on his or her individual circumstances, but

with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a

spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years

of imprisonment.   The misdemeanor defendants will generally fall on the lower end of that

spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A

---

[46]     Gov't Ex. 14.
[47]     Gov't Ex. 20.
[48]     Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[49]   As Judge Lamberth has admonished, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."   *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PLF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect … 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.'   And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences – such as how a defendant entered the Capitol, whether he incited others, what areas he reached inside the Capitol building, what he did in those areas, the nature of any statements he made (on social media or otherwise) since January 6, 2021, etc. – help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's manifestation of genuine remorse.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who pleaded guilty and cooperated with the government).

---

[49]     Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government" when defendants plead guilty early in criminal proceedings") (citation omitted).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed."  *United States v. Godines*, 433 F.3d 68, 69-71 (D.C. Cir. 2006).  "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later."  *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").  In cases, like this one, for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."  *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-1344 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses are an appropriate group for purposes of measuring disparity of any future sentence.

2.     While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider, for reference, the sentence of Annie

Howell, who, like Evans, pleaded guilty to violating 18 U.S.C. § 1752(a)(1).  *See United States v. Howell*, No. 21-cr-217 (TGH).  Howell was sentenced to 60 days of intermittent confinement, in spite of mitigating health and family circumstances, in a case in which the aggravating factors included pre-riot attempts to meet with the Proud Boys; awareness of the high risk of potential violence at the Capitol; climbing through a broken window to enter the Capitol building; and making statements on social media during and after the riot that displayed a lack of genuine remorse and openness to future violence.  *See Howell* 2/2/2022 Tr. 27-36; *Howell* Gov't Sent. Memo. (Doc. 35), at 2, 8, 23.

In addition, this Court may consider cases involving defendants who entered sensitive places within the Capitol.  A defendant's entry into a sensitive space puts that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces.  Indeed, one of the most infamous photographs form January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk.  That photograph has become notorious, in all likelihood, precisely because of what invading the workspace of Members of Congress and their staffers represents: a show of intimidation and an attempted display of power, above and beyond entering the building.  For good reason, judges of this Court have repeatedly imposed terms of incarceration in cases involving defendants who invaded the workspaces of Members of Congress and their staffers.  *See, e.g.*, *United States v. Derek Jancart and Erik Rau*, Nos. 21-cr-148 (JEB), 21-cr-467 (JEB) (sentencing to 45 days of incarceration misdemeanor defendants who had reached the Speaker's conference room); *United States v. Courtright*, No. 21-cr-72 (CRC) (sentencing to 30 days of incarceration a misdemeanor defendant who reached the Senate Floor, even though she does not appear to have known where she was); *United States v. Andrew Ericson*, No. 21-cr-506 (TNM) (sentencing to 20 days of intermittent confinement a misdemeanor defendant who entered

the Speaker's conference room and posted a photo of himself with his feet on the conference table and took a beer from the fridge); *United States v. James Bonet*, No. 21-cr-121 (EGS) (sentencing to 90 days of incarceration misdemeanor defendant who smoked what appeared to be marijuana in a Senator's private office, broadcast it triumphantly on social media, and later downplayed the January 6 attack in a news interview).  Here, Evans deliberately entered a Congressional conference room (which he incorrectly believed to be Speaker Pelosi's), climbed on a window's inside sill to gesture triumphantly to the mob outside, and took a celebratory shot of whiskey, which another rioter recorded on video.  Evans, too, should receive a reasonable term of imprisonment as part of his sentence.

Finally, this Court may consider the sentences imposed on defendants who have used their participation in the January 6 attack for fundraising and establishing a social media presence.  *See, e.g.*, *United States v. Eduardo Gonzalez*, No. 21-cr-115 (CRC) (sentencing to 45 days of incarceration a misdemeanor defendant who exploited his participation in the January 6 attack to develop a social media presence and business interests); *United States v. Jennifer Leigh Ryan*, No. 21-cr-50 (CRC) (sentencing to 30 days of incarceration a misdemeanor defendant who glorified the January 6, 2021 attack in media postings, spread false information about the attack, and sought to exploit her presence during the attack for profit).  Similarly, Evans has aggressively exploited his presence at the Capitol during the January 6 attack to expand his social media presence on GETTR; to increase traffic on this website (www.condemnedusa.com); and to give interviews and public speeches about January 6.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently – differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id.* at 1095.

## VI.     Conclusion

Sentencing requires the Court to consider the Guidelines and carefully balance the § 3553(a) factors.  Based on those considerations, the government recommends that this Court sentence Treniss Evans to 60 days' incarceration; one year of supervised release; 60 hours of community service; and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime, but is no longer than necessary.

May 16, 2022                          Respectfully submitted,

                                      MATTHEW M. GRAVES
                                      UNITED STATES ATTORNEY
                                      D.C. Bar No. 481052

                          By:     */s/ Francesco Valentini*
                                      Francesco Valentini
                                      D.C. Bar No. 986769
                                      Trial Attorney
                                      United States Department of Justice, Criminal Division
                                      Detailed to the D.C. United States Attorney's Office
                                      601 D Street NW
                                      Washington, D.C. 20530
                                      (202) 598-2337
                                      francesco.valentini@usdoj.gov