𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 ℭ𝔬𝔲𝔯𝔱
𝔉𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 ℭ𝔬𝔩𝔲𝔪𝔟𝔦𝔞
--------------------------------------------------------------X


UNITED STATES OF AMERICA,

                                        Case #: 1:21-cr-225 (DLF)


              *v.*

TRENISS JEWELL EVANS III,


                        *Defendant.*
--------------------------------------------------------------X

### NOTICE OF SUPPLEMENTAL AUTHORITY RELATING TO DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO EARLY TERMINATION OF PROBATION


TRENISS JEWELL EVANS III, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, and with assistance from counsel, and hereby submits this declaration as his additional brief in support of his motion for early termination of supervised release pursuant to 18 U.S.C. § 3583(e)(1); addressed herein are, *inter alia*, Mr. Evans interpretation as to the weakness of the 1752 count, which he was charged with and which remained a count when he accepted a plea in this matter. To illustrate his point, he provides a description below of a Court of Appeals decision (3 judge panel) relating to the one Count on which Evans pled guilty, 18 U.S.C. 1752, and suggests that the Court might find this new development in the precedential law helpful to its current consideration.

## I.   NEWLY-ISSUED PRECEDENTIAL AUTHORITY:
### *United States v. Couy Griffin, U.S. Court of Appeals for the District of Columbia Circuit, Record No. 22-3042 (October 22, 2024)*

1.      The new emerging developments in the application of 1752 and January 6th, require further consideration.

2.      Mr. Evans is not challenging his plea, but however, requests this Court to consider that there are significant weaknesses within the Government's application of 18 U.S.C. 1752 under the circumstances and facts concerning events of January 6, 2021, on Capitol Hill in Washington, D.C.

2.      In balancing the issues, including the punishment imposed so far and Treniss Evans' exemplary compliance – according to the probation office itself – the weaknesses of 18 U.S.C. 1752 applied in this situation may also affect the Court's balancing of the concerns.

3.      On October 22, 2024, just Tuesday morning at 10:01 AM, a panel of the U.S. Court of Appeals for the District of Columbia Circuit led by the Honorable Judge Pillard issued a 2-1 decision in the appeal of *United States v. Couy Griffin*, Record No. 22-3042, appealing from Case No. 1:21-cr-00092 from the U.S. District Court for the District of Columbia concerning the requirements for a conviction under 18 U.S.C. 1752.

4.      I, Treniss Evans, have not moved to set aside my guilty plea in this case.  I understand that while that can be warranted, it is a detailed and challenging process.  It is not something that I would be involved in "accidentally" or inadvertently.

5.      Despite over-the-top descriptions of my ill-fated curiosity tour inside the U.S. Capitol building on January 6, 2021, once I understood that physically entering the U.S. Capitol[1]

---

[1]      Many prosecutions of January 6 Defendants have unfortunately sometimes confused "the Capital" with "the Capitol" in social media posts, text messages, and chats.  Many planned and decided to go to "the

building that day was the wrong way to go about political expression, I have never failed to tell everyone who will listen, in social media threads, radio interviews, and every event, that people must obey the law even while not being scared out of their constitutional rights and civic duties as citizens.

6.      It is a difficult balance, but an important one.  It is the death of a constitutional Republic and it is tyranny to be intimidated into silence and allow wrongs to go unchallenged.  But I have now realized as I have repeatedly said that even though we are participants in our country's governmental affairs and political decisions, as the owners of this country, we must be careful to participate without breaking the law ourselves.

7.      However, in evaluating my request for early termination of supervision, the Court might find the validity of the 18 U.S.C. 1752 charge I pled guilty to a relevant consideration about the right balance on supervised release.

8.      I have already served the time to which I was sentenced, but I am asking that the residual supervision be curtailed by the Court's adjustment now.

9.      A term of imprisonment is not subjective.  It is clear, unambiguous, and precise.

10.      By contrast, the supervisory period after imprisonment is subjective, standardless, vague, and subject to the unfettered whim perhaps in bad faith of officials.  The vagueness and over-breadth is and is intended to be a chilling effect on the exercise of otherwise valid constitutional rights.  Does any particular retaliatory, vindictive, or petty response meet the standards of "strict scrutiny" in curtailing constitutional rights?  Who knows?  It is too vague.

---

Capital" but not "the Capitol."  Many, like myself, made plans and discussed ahead of time going to "the Capital" – the city of Washington, D.C. – to hear what might have been Trump's last public speech and to be observers and participants but had no prior plans to go to "the Capitol."  Among other things, Trump's comments from the Ellipse that he would be joining crowds who had previously determined (as Trump described it) to march down to the Capitol suggested that Trump would be speaking there.  The economy of Washington, D.C. would collapse without tourist visitors.

11.     However, in *United States v. Couy Griffin*, on October 22, 2024, Judges Pillard and Rogers decided, with Judge Katsas dissenting, the application of 18 U.S.C. 1752.

12.     The Panel over-ruled trial-level dismissals which had decided that the qualifier "knowingly" in the statute requires that a defendant must know that a Secret Service protectee is the reason for the declaration of a restricted building or grounds (loosely "restricted area"), in this case a dismissal by the Honorable Trevor McFadden.

13.     The Panel wrote:

> The defendant says a person "knowingly enters" the restricted safety zone only if he knows that the basis of the restriction is to safeguard a Secret Service protectee. Id. § 1752(a)(1). We hold that knowingly breaching the restricted area suffices, even without knowing the basis of the restriction— here, the presence of Vice President Pence at the Capitol on January 6— which merely confirms that such trespasses are within Congress's legislative authority. Traditional tools of statutory interpretation establish that Congress intended to criminalize trespasses endangering Secret Service protectees regardless of the trespasser's awareness of the basis for Congress's authority to regulate them.

14.     However, in doing so, the Appellate panel stepped in a much bigger pail.  The Panel endorsed a previous trial-level controversy that only the U.S. Secret Service has the power to declare a restriction (what the panel re-dubs a "safety zone"):

> It does so by empowering ***the Secret Service*** to prevent unauthorized people from knowingly encroaching on "posted, cordoned off, or otherwise restricted" safety zones where the President or Vice President (current or past), a leading candidate for such office, or any of a handful of other Secret Service protectees "is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B)

*Id. (emphasis added).*

15.     Therefore, only the Secret Service has power to declare a restricted grounds or restricted building (except where the statute automatically designates the White House as an always-restricted area).

16.      However, the Secret Service _did not_ declare any restricted area or grounds on or about January 6, 2021, at or around Capitol Hill.

17.      The U.S. Capitol Police Board on September 3, 2020, declared a _construction zone_ on the Capitol Grounds to continue from September 7, 2020, through February 21, 2021.  See: https://www.uscp.gov/media-center/press-releases/access-west-front-us-capitol-restricted-inauguration-platform

18.      Therefore, no one – not one – of the roughly 1500 persons charged with violating 18 U.S.C. 1752 (everyone charged with anything relating to January 6, 2021, was at least charged with 18 U.S.C. 1752 of "entering or remaining" in a restricted area).

19.      All 1,500 charges of violating 18 U.S.C. 1752 are invalid and must be dismissed or vacated after conviction.  Even those who pled guilty are entitled to dismissal of the charge where (a) they pled guilty to something that is not a crime and (b) new information changes the basis on which they chose to plead guilty.

20.      The Panel like the prosecutors and trial judges make at least five (5) major mistakes. First, 18 U.S.C. 1752 contains a statutory definition in 18 U.S.C. 1752(c).  The statutory definition pre-empts any other definition or common understanding.  If a statute defines a pineapple as an orange, then a pineapple is an orange, per the statutory definition.

21.      Second, one can only violate 18 U.S.C. 1752 under the definition provided in 18 U.S.C. 1752(c).

22.      Third, there are a variety of laws that might apply, but not 18 U.S.C. 1752.  If the Architect of the Capitol were re-sodding the Capitol Grounds and a group played scrimmage football on the lawn, ruining the new sod, there might be some law that governs that – but 18 U.S.C. 1752 does not apply.

23.     If the Architect of the Capitol were fumigating the Capitol building because a flock of cicada insects had taken up refuge there, and closed the building to avoid risks from the chemicals, some health-related law might apply.  But 18 U.S.C. 1752 would not.

24.     If the Metropolitan Police Department chased a fugitive who ran into the Capitol building to hide, and the police asked everyone to leave the building while they search for the fugitive, certainly some law might apply.  But 18 U.S.C. 1752 would not.

25.     Certainly, if a PETA protestor threw fake blood on a Member of Congress, some law would be violated.  But it would not be 18 U.S.C. 1752 he could be charged with.

26.     <u>Fourth,</u> Congress specifically added the qualifier "knowingly."   All the other opinion-mongering is irrelevant, where Congress mandated "knowingly."  The Dissent by Katsas writes on page 4:

> "As a matter of ordinary English grammar, it seems natural to read" the word knowingly, if it introduces a criminal prohibition, "as applying to all the subsequently listed elements of the crime." *Flores-Figueroa*, 556 U.S. at 650; see *Rehaif v. United States*, 588 U.S. 225, 230 (2019) (courts "ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element" (quoting *Flores-Figueroa*, 556 U.S. at 652)); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 79 (1994) (Stevens, J., concurring) ("the normal, commonsense reading of a subsection of a criminal statute introduced by the word 'knowingly' is to treat that adverb as modifying each of the elements of the offense identified in the remainder of the subsection")

27.     <u>Fifth,</u> Congress specifically enacted 40 U.S.C. 5104 and related laws to apply to Congressional buildings like the Capitol.  18 U.S.C. 1752 is not naturally related in any way to the Capitol or Capitol Hill.  The appropriate law is 40 U.S.C. 5104.

28.     Therefore, the existence of a restricted area for some other reason is irrelevant.

29.     An area must be restricted only by the Secret Service pursuant to 18 U.S.C. 1752:

> And a contrary interpretation would impair the Secret Service's ability to protect its charges. It would require Secret Service agents preventing

members of the public from encroaching on a temporary security zone to confirm that each intruder knows that a person under Secret Service protection is or is expected to be there. Neither the text nor the context of the statute supports that reading.

30.     Clearly, the statute is to be used by the Secret Service, not the U.S. Capitol Police Board for construction purposes.

31.     Actually, this paragraph by the Panel is nonsense. The Secret Service could simply post a sign. Signs are not new technology. The following sign was actually posted in May 2024 where former President and Presidential candidate Donald Trump was speaking at the Libertarian Party convention. Notice how old and well-used the sign is.



32.     This sign is also an admission and endorsement that the Secret Service activates 18 U.S.C. 1752 and declares a restricted area.

33.     Again, the "AREA CLOSED" signs on Capitol Hill were posted on September 7, 2020, by the U.S. Capitol Police Board explicitly for the purpose of construction purposes.

34.     On page 4 of the majority opinion:

> The government acknowledged its obligation to prove that Griffin knew the grounds were restricted; Griffin challenges the sufficiency of the proof on that point. The government disagreed that the statute also requires proof that Griffin knew precisely why the area was restricted, and the district court held that the government did not "have to prove [he] knew that a specific dignitary was there." J.A. 534.

35.     On page 4 of the majority opinion, under (I)(A), the following was held:

> Section 1752 enables the Secret Service to protect the people and events they guard in settings the statute refers to as "restricted building[s] or grounds." 18 U.S.C. § 1752(a). The statute has three subsections. Subsection (a) prohibits a range of conduct connected to those sites, including the trespass offense at issue in this appeal, as well as engaging in "any act of physical violence" therein, and obstructing the means of ingress and egress to those sites with the intent to impede or disrupt government business. Id. §§ 1752(a)(1)-(5). Subsection (b) provides for criminal penalties, including imprisonment or a fine, or both, for those who violate subsection (a). Id. § 1752(b). The offense is punishable as a misdemeanor, id. § 1752(b)(2), unless a deadly or dangerous weapon is used or significant bodily injury results, in which case it may be punished as a felony, id. § 1752(b)(1).

36.     But the Panel digs the Government much deeper into this sink hole.  The Panel proves that Secret Service control over 18 U.S.C. 1752 is "of the essence" in my words, the very heart of the statute.  Because the very purpose of the statute and the way it is phrased and structured is to give the Secret Service independent authority without relying on other law enforcement officials, the Panel has (perhaps inadvertently) proven that only the Secret Service can declare a restricted area.  Starting on page 5:

> Section 1752 did not always have this three-part structure. It was enacted in 1971 as a more streamlined statute focused on protecting the President in the wake of a series of political assassinations in the 1960s— particularly those of President John F. Kennedy in Dallas and then-presidential candidate Robert F. Kennedy in Los Angeles. In recognition of the rising levels of violent political rhetoric and the "constant

excoriation of America's institutions and leaders" that made holding the office of the presidency increasingly dangerous, Congress set out to provide stronger and more standardized security for the President. S. Rep. No. 91-1252, at 4 (1970). Congress recognized the complex challenges of protecting national leaders away from their usual offices or residences, where they are "most vulnerable"—whether from an "isolated and deranged individual" or from "organized premeditated attempts" on their lives. Id. at 6.

At the time, no statute conferred federally enforceable authority on the Secret Service to restrict entry to places temporarily visited or used by the President. Instead, the Service relied on "the assistance of local authorities to arrest persons" under a patchwork of state and local criminal statutes—an arrangement that rendered it "increasingly difficult to maintain the necessary level of security" when local authorities were not present and closely coordinating or when the proper jurisdiction for arresting and prosecuting violations was unclear. Id. at 7. To remedy that impediment to presidential security, Congress enacted section 1752, creating a federal offense encompassing trespasses that the Secret Service had previously relied on state and local officials to enforce under state and local trespass laws. Id. at 7. In this way, Congress provided "a uniform minimum of Federal jurisdiction for Presidential security when the President is on temporary visits," id. at 6, by empowering the Secret Service to prevent "physical presence [and] physical violence within the security perimeter" created by temporarily restricted areas surrounding the President, id. at 9. Over the decades, Congress has repeatedly revisited section 1752, expanding its coverage to align with the broader scope of the Secret Service's protective duties. At first, the statute protected only places designated as the President's temporary residence or office or any other building or grounds where the President was or would be temporarily visiting. See 18 U.S.C. § 1752(a)(1) (1971). In 1982, Congress amended the statute to extend "the same 'zone of protection' authority" applicable to the President to all Secret Service protectees (which includes the Vice President). See Pub. L. No. 97-308, 96 Stat. 1451, 1451-52 (1982). In 2006, Congress again amended the statute to apply beyond sites temporarily visited by protectees to also shield any "event designated as a special event of national significance." See Pub. L. No. 109-177, 120 Stat. 192, 252 (2006). Finally, in 2012, Congress added federal protection against intrusion into the White House or Vice President's residence or their grounds. See Pub. L. No. 112- 98, 126 Stat. 263, 263-64 (2012). In so doing, Congress acknowledged that the Secret Service had previously relied on District of Columbia trespass law to protect those sites. H.R. Rep. 112-9, at 2 (2011). 1

37.    Even the dissent by Judge Katsas gets this wrong: "At that time, entry into the grounds was restricted because Congress was scheduled to count the votes of the presidential electors." *(See* Dissent, at page 1, ECF p. 46).

38.    But this is false.  As previously shown, entry into the grounds was restricted on September 7, 2020, because of construction.  The grounds were not restricted "because Congress was scheduled to count the votes."  The Secret Service had nothing to do with the construction from September 7, 2020, through February 21, 2021.

39.    The majority opinion again confirms that it is the Secret Service which designates – and announces the restricted area:

> The drafting history confirms as much. When Congress first promulgated section 1752, it "anticipated that ***the Secret Service [would] make every effort . . . to make such restricted areas known to the public***," S. Rep. 91-1252, at 9, but it declined to list exhaustively the ways in which the public would be excluded. B

*Id.* at 15.

40.    Judge Katsas in Dissent also argues on pages 17-21 of the Dissent, ECF p. 62-66, that the statutory definition is jurisdictional.  That is, if the statutory definition of a restricted area under 18 U.S.C. 1752(c) is not met, the Grand Jury and the Court have no jurisdiction to punish a purported violation of 18 U.S.C. 1752.

## XII.  CONCLUSION

41.    Therefore, the Court should consider that the application of 18 USC 1752 is weak and very likely legally invalid in evaluating Evans' current request.

42.    In making that evaluation, the Court should consider that 40 U.S.C. 5104 and subsections and related statutes specifically applies to Congress and Congressional buildings and grounds, whereas 18 U.S.C. 1752 does not.  A restricted area under 18 U.S.C. 1752 could be a tractor factory in Nebraska or a football game in Dallas, Texas, or a public elementary school in

Sarasota, Florida, where the President is reading books to the children on September 11, 2001, or a private home in Beverly Hills, California where the homeowner is hosting a fund-raiser for a President's re-election.   There is no automatic connection to Congress, Capitol Hill, or Washington, D.C. at all (except where the White House and the Vice President's residence automatically qualifies for the definition).

43.    I respect this court and the rule of law. My sentence of both intermittent confinement and three years of supervised release is further improper because the entirety of his sentence should have been concluded within one year, based on statutory limits.


*Treniss Evans*
TRENISS EVANS